WILLIAM D. TABER, Respondent, *v.* THE BOARD OF SUPER-
VISORS OF ERIE COUNTY, Appellant.

The word "quota" in the act of 1865 (Chap. 29, Laws of 1865), providing for filling the quota of men required from this state for the United States service, meant the quota which had been fixed and assigned by the national authorities, and when it referred to the quota, state or local, under the call of December 16, 1864, it meant, not only the fixed and assigned number, but that number of actual men to be placed in the field.

The aim of the act was to stop the competition of localities and to spread the burden of taxation equally over the taxable property of the state; for this purpose it began with the quota ascertained and assigned under the December call, and the state bounty authorized was payable only to volunteers necessary to fill the quota as so assigned and as assigned under future calls.

While in carrying out the policy of equalizing the burden of taxation, provision was made for reimbursing each locality for previous expenditures, so far as it had produced, since said December call, actual men to apply upon the assigned quota, and so far as the quota had been lessened and relieved by a previously existing excess to the credit of the locality,

no bounties were to be given to anyone back of the assigned December quota.

Accordingly *held*, that under the provision of said act (§ 6) which directs a bounty to be paid " to any person who has furnished or who shall furnish an acceptable substitute to apply on the quota under the call of December 19, 1864, which substitute shall have been accepted by the authorities of the United States and credited to the town, city or county * * * and which substitute shall go to reduce the quota in such town or county," to entitle a person, who furnished a substitute, to the bounty the substitute must have applied not only on the quota of the state as assigned under the specified call but must have been credited upon the assigned quota of the principal's district of enrollment and so have gone to reduce it.

As each individual who was enrolled as liable for military duty and who furnished a substitute owed the duty and so when he paid for a substitute, simply performed his duty by proxy, the state owed him nothing and no equity called for a reimbursement to him.

A principal not enrolled, who before December, 1864, furnished a substitute, acted voluntarily and was not entitled to reimbursement.

Accordingly *held*, that principals who, prior to the December call had furnished substitutes, were not entitled to recover of their county any portion of the sum paid to the county by the state on settlement of its claim for reimbursement for local bounties paid, although the substitutes contributed *pro rata* to the excess which operated to relieve the county in the December assignment of quotas.

*It seems* that if any portion of the money was paid by the agent of the state to the county for the use of the principals who so furnished substitutes, it was paid without authority, and did not bind the state. If any sum was paid in excess of what the county was entitled to, the excess belongs to the state and said principals are not entitled thereto.

(Argued February 11, 1892; decided March 1, 1892.)

APPEAL from judgment of the General Term of the Supreme Court in the fifth judicial department, entered upon an order made March 31, 1891, which overruled defendant's exceptions, denied a motion for a new trial and directed a judgment in favor of plaintiff to be entered upon a verdict directed by the court.

This action was brought to recover for moneys alleged to have been received by the defendant from the state for the plaintiff's assignors, who had furnished substitutes for the military service of the United States during the war of the Rebellion. A trial was had in May, 1890. At the close of the

evidence a verdict was directed in favor of the plaintiff for $211,851.59, being $400 each for 201 men, and interest.

Charles E. Young, one of the supervisors of the county of Erie, and its alleged agent, in the summer of 1865, secured from the state, in all, $978,563, of which $482,200 was obtained under the settlement of the 6th of July, 1865. The controlling paper used on the July settlement, which related to excess of years, was Young's affidavit, of which the following is a copy:

" STATE OF NEW YORK,     } *ss.:*
" *City and County of Albany.* }

" On this sixth day of July, A. D. one thousand eight hundred and sixty-five, before me, the undersigned, a commissioner of deeds, duly authorized by law to administer oaths within and for the county aforesaid, personally appeared Charles E. Young, who, being duly sworn, deposes and says that he is the representative accredited agent of the county of Erie, state of New York, and has had sole charge of the payment of local bounties for said county· on the call of July 18th, 1864; that the persons making twenty-four hundred eight years' excess were enlisted and credited to the said county on the quota under call Dec. 19, 1864, and reduced the quota to the extent credited, and that the men making said excess were paid a sum as bounty equal to two hundred dollars per year, and that the one hundred and thirty-three men on former calls were mustered between July 1st and July 18, 1864, for which sums they do now claim, on behalf of said county, reimbursement from the state of New York, under the provisions of chap. 29, Laws of 1865.     C. E. YOUNG."

All of the substitutes furnished by the assignors of the plaintiff went into the army prior to December 19, 1864.

Further facts appear in the opinion.

*William B. Hoyt* and *James M. Humphrey* for appellant. The statute gives a bounty only to those principals who furnished substitutes which were applied on the quota under the

call of December 19, 1864, as fixed by the authorities of the government of the United States, and none of these substitutes were so applied. (*Kemmler* v. *Durston*, 119 N. Y. 569, 578; *People* v. *Suprs.*, 43 id. 130; *People* v. *Schoonmaker*, 63 Barb. 44, 47; *Blake* v. *N. Bank*, 23 Wall. 307; *People ex rel.* v. *Dayton*, 55 N. Y. 367; *Perkins* v. *Smith*, 116 N. Y. 441; Laws of 1864, chap. 8; Laws of 1865, chaps. 14, 105, 252, 397, 440, 443, 510, 529, 532, 549, 665.) If the county demanded and received the money on the excess settlement, as a reimbursement for what it had expended in obtaining an excess of years on the July call, and not as agent for plaintiff's assignors, the action for money had and received will not lie. (*Decker* v. *Saltzman*, 59 N. Y. 275; *Murphy* v. *Ball*, 38 Barb. 262; *Butterworth* v. *Gould*, 41 N. Y. 450; *Patrick* v. *Metcalf*, 37 id. 332; *Town of Gallatin* v. *Soucks*, 21 Barb. 578; *Hathaway* v. *Humer*, 54 N. Y. 655.) Whether the defendant received this money as a reimbursement for what it had expended, or as agent for plaintiff's assignors, was a question of fact for the jury, and the direction of a verdict for plaintiff was error. (*Stokes* v. *Johnson*, 57 N. Y. 673; *Greenwood* v. *Schumacher*, 82 id. 614.) The plaintiff failed to prove either allegation in each count of the complaint, viz. : (1) That such assignor never received from said city, county or state any sum of money whatever for having furnished said substitute; (2) Demand; and without such proof the plaintiff cannot recover. (*Sears* v. *Patrick*, 23 Wend. 528; *Lorillard* v. *Clyde*, 122 N. Y. 498; *Bigelow* v. *Davis*, 16 Barb. 561.) Interest should have been allowed, if at all, only from the commencement of this action. (*Ashhurst* v. *Field*, 28 N. J. Eq. 315; *R. G. Factory* v. *Ried*, 5 Cow. 589.) The court erred in overruling defendant's objections to the admission and rejection of evidence. (Code Civ. Pro. §§ 944, 957; Laws of 1878, chap. 219; Laws of 1884, chap. 328.)

*Frederic Almy* and *E. C. Sprague* for respondent. The plaintiff has to show only that the bounty money was received by the defendant for the use of plaintiff's assignors. Every-

thing else is immaterial.    (Laws of 1865, chap. 29, § 6 ; *Wood-worth* v. *Bennett*, 43 N. Y. 273, 276 ; *Moss* v. *R. L. Co.*, 5 Hill, 137 ; *Parish* v. *Wheeler*, 22 N. Y. 494 ; *Bissell* v. *M., S. & N. I. R. R. Co.*, Id. 258 ; *S. O. Co.* v. *Scofield*, 16 Abb. [N. C.] 372 ; *Lawrence* v. *Fox*, 20 N. Y. 268 ; *Hartley* v. *Harrison,* 24 id. 170 ; *Burr* v. *Beers*, Id. 178 ; *Hutchings* v. *Miner*, 46 id. 456 ; *Seward* v. *Huntington*, 94 id. 104 ; *Garnsey* v. *Rogers*, 47 id. 233 ; *Vrooman* v. *Turner*, 69 id. 280 ; *Litchfield* v. *Flint*, 104 id. 543 ; *Roberts* v. *Ely*, 113 id. 128 ; Laws of 1865, chap. 29.)    The plaintiff's assignors as a class were entitled to receive state bounty under the statute. (Laws of 1865, chap. 29, § 6.)    The burden of proof as to payment by the bounty committee is on the defendant, who nowhere even claims that money was paid by its bounty committee directly to any of the assignors, or even to the substitutes with their assent.    (*Knapp* v. *Roach*, 94 N. Y. 329 ; 1 Chitty on Pleading, 223 ; *Sheldon* v. *Clark*, 1 Johns. 513 ; *Bennett* v. *Hurd*, 3 id. 438 ; *Teel* v. *Fonda*, 4 id. 306 ; *Hart* v. *Cleis*, 8 id. 44 ; *Nagel* v. *City of Buffalo*, 34 Hun, 1, 5 ; *Harris* v. *White*, 81 N. Y. 532, 546 ; *Bloodgood* v. *M. & H. R. R. Co.*, 18 Wend. 9, 25 ; *Sherwood* v. *Mitchell*, 4 Den. 435, 436 ; *Beardstown* v. *Virginia*, 76 Ill. 34 ; *G. W. R. R. Co.* v. *Bacon*, 30 id. 347 ; *Fleming* v. *People*, 27 N. Y. 329 ; *People* v. *Briggs*, 114 id. 56 ; Greenl. on Ev. § 79.)    The defendant's exceptions to the admission of the documentary evidence cannot be sustained.    (Laws of 1884, chap. 327 ; *People* v. *Snyder*, 41 N. Y. 397 ; *Van Rensselaer* v. *Vickery*, 3 Lans. 57 ; Code Civ. Pro. § 944 ; Greenl. on Ev. §§ 484, 485, 508 ; *City of Worcester* v. *Town of Northborough*, 140 Mass. 397.)    Upon money advanced by one person for the use of another, interest is recoverable from the time of the advance, in the absence of any express agreement on the subject. (*Gillett* v. *Van Rensselaer*, 15 N. Y. 399 ; *Eldred* v. *Eames,* 48 Hun, 253, 256 ; 1 Suth. on Dam. 628.)

Finch, J.    The facts of this case take us back to the days of the Civil war, and the period not far from its close when

the armies in the field were maintained in their full and efficient strength by the help of the conscription. Before the act of 1865 (Chap. 29), the construction and effect of which is involved in this controversy, the supply of men for the ranks was largely procured by a system of local bounties. Towns, cities and counties incurred heavy liabilities in the process, and bidding against each other raised the price necessary to be paid. As a result great inequalities occurred. One locality would furnish its men, in number or years of service in excess of its proper share, while another would reach merely to the level of its duty or fall somewhat below it. These local bounties in the main rested upon the local taxation, and were fed by the proceeds of bonds or other obligations chargeable as debts upon the taxable property of the locality. If there were subscriptions or gifts by individuals, these were few and slight compared with the corporate contributions which in the end rested upon the taxpayers of the district in the ordinary and just proportion as between themselves. But the inequalities of men furnished to the nation involved also an inequality of financial burdens as between different localities, some bearing more than their true share and others less. The legislation of 1864 fully recognized, and validates and seeks to regulate, this system of local bounties, and both describes the manner in which the funds were usually raised and the debts therefor incurred, and makes those debts the valid obligations of the municipalities which had created them. (Laws of 1864, chaps. 8, 72, 390.) In July of that year the emergencies of the struggle led to a call by the President for five hundred thousand men, which had two important characteristics. If not met, as had previously been done, by the enlistment of volunteers it was to be met by a conscription. Behind it stood the shadow of a draft compelling performance of the citizen's duty when no other resource remained. But with that compulsory measure in view, equality between localities, exact fairness in the distribution of the dreaded and unwelcome burden, became an inexorable necessity, and not for one moment to be neglected or disregarded; and so the officers whose duty it

was to distribute the total demanded among the districts in
due proportion to their enrollment of men liable to military
duty were also required to credit and apply upon that quota,
ascertained upon the basis of the enrollment, any excess beyond
its due share which had been furnished previously by a par-
ticular district. The quota of a locality under this call was
its due proportion of the five hundred thousand men, but could
be reduced by existing credits as well as by new enlistments.
A previous excess in the military supply could be used to fill
and satisfy the demand as well as new and actual volunteers.
The determination of that excess necessarily took into account
the years of service. A soldier enlisted for a term of three
years was equal to three serving only for one year each, and
since the call of July could be filled by men enlisting for but
one year, equality between localities required a consideration
of the years of service supplied, and the rule of computation
took account of those years. The resultant excess was applied
upon and served to fill the quota as founded upon the enroll-
ment. The result, however, was a disappointment to the
national authorities. Instead of five hundred thousand men
the call yielded only about half that number, the balance being
exhausted by credits due to localities and allowed to apply
upon their respective quotas. As a consequence, on the nine-
teenth of December following, the President made a further
call for three hundred thousand men. Not as before, that
number made up of men and credits, but that number of actual
men. Nothing could apply upon and reduce that call except
new men mustered into the service. No credits and no excess
could lessen it, but it was still possible in assigning quotas as
between localities unequally performing their duty to have
respect to an existing excess standing to the credit of a dis-
trict; and since a conscription stood behind this call also, the
quotas were assigned, taking such credits into account. The
quota of a district which had provided an excess was thus a
less number of men than the bare basis of the enrollment would
require, while that of a district in arrears of its duty was
greater; but in each case the quota as assigned was a fixed

number to be filled only by men, and upon which no credits could apply.   The difference between the two calls, therefore, was that the quota under the first could be filled or reduced by credits for a prior excess, but the quota under the second could not be so filled or reduced; the one could be satisfied with credits and men, the other only with men.   The December quota of the 30th congressional district was fixed by the competent national authorities at 2,194 men.   That quota thus assigned, after all equitable considerations had been allowed their force, was a fixed demand upon which nothing could apply but men thereafter enlisted and mustered into the service.   How it was reached was one thing; how it could be filled was another and different thing.

With this state of facts before it, existing in greater or less degree in every locality, the legislature passed the act of 1865. The quota of the state had been assigned and was fixed and known, to be filled only with men, and from which all questions of excess or credit had been eliminated.   The corresponding quotas of districts had also been assigned and were known and understood, and only enlisted men actually entering the service could reduce or affect them.   When, therefore, the legislature spoke of the quota of the state, or the quota of certain of its divisions, it meant and could only mean the quota which had been fixed and assigned by the national authorities and not some other imagined or ambiguous number.   And when it referred to the quota, state or local, under the call of December 19, 1864, it meant not only the fixed and assigned number, but that number of actual men to be placed in the field.   The act is entitled, among other specifications, "An act to provide for filling the quota of men required from this state for the army and navy of the United States," and its final section provides: "For the purpose of filling the quota of men required for the army and navy of the United States from this state under the last call of the President dated December 19, 1864, and also under any future call or calls which may be made during the present war, a state bounty shall be paid to volunteers furnished from this state as in this act provided."

Considering that section by itself and standing alone, it can
have but one meaning.   To fill the assigned and existing quota
of the state with men actually mustered into the service and
any future calls during the war, the state took upon itself the
burden of paying bounties and forbade the further action of
the municipalities in that direction.   The aim was twofold; to
stop the competition of localities, and to spread the burden of
taxation equally over the taxable property of the state instead
of leaving it to be borne in unequal proportions by separate
districts.   But the new process had to begin somewhere, at
some specific and definite point, and so it began with the quota
already ascertained and assigned under the December call, and
extended thence forward but not backward.   That this is so
is made very plain by the terms of the next section which
show also the purpose to equalize the taxation necessary to
support bounties.   That section begins with a provision in
these words : " Such bounty shall be paid to so many volunteers
furnished from the several towns and cities of this state as shall
be necessary to fill the quota of said towns and cities respect-
ively, fixed by the authorities of the government of the United
States under said call or calls."   This language makes it quite
plain that the state bounty authorized was payable only to
volunteers who were necessary to fill the quota as assigned by
the national officers and actually existing with its demand for
men instead of credits, and to such volunteers as should enlist
under future calls, and so the provision was followed by con-
ditions that the described volunteers should be actually accepted
and mustered into service and applied upon and in reduction
of the assigned quota.   The meaning thus definitely attached
to a quota under the December call for men must be retained
through the remainder of the act unless plainly modified by
later and qualifying expressions.

But while the bounties to be given were to begin with those
who should fill the assigned December quota, the policy of
equalizing the burden of taxation by spreading it in just pro-
portion over the property of the state required that the local
taxation supporting the previously-paid local bounties should

in some manner be equalized and absorbed in the broader scheme; and this was accomplished, not by giving bounties back of the assigned December quota to anyone, but by reimbursing to the localities their previous expenditure for local bounties so far as that had produced since December 19, 1864, actual men to apply upon the assigned quota, and so far also as that assigned in a particular locality had been lessened and relieved by a consideration of previously-existing excess standing fairly to the credit of the district. The process thus was wholly one of reimbursement to a limited extent of local bounties which had accomplished or should accomplish either of the two specified results, but no bounties were given or authorized to enlisted men back of the assigned or existing quota of December nineteenth, and the act gives no indication of any such purpose.

We are prepared now to consider the sixth section of the act upon which the plaintiff relies, and it begins thus: "A bounty to the amount hereinbefore provided shall be paid to any person who has furnished or who shall furnish an acceptable substitute to apply on the quota under the call of December 19, 1864." Stopping at that point we see that the state bounty previously given to volunteers whose actual enlistment applies upon and aids to fill the existing assigned quota is extended also to persons who become such volunteers by proxy, that is, who at their own expense put in a substitute whose enlistment appears upon and helps to fill the assigned quota demanded in men by the nation from the state. The section then proceeds: "Which substitute shall have been accepted by the authorities of the United States and credited to the town, city or county in which said person shall be enrolled and which substitute shall go to reduce the quota in such town or county." That is to say, the substitute must not only apply upon the quota of the state as assigned under the specified call, but he must also be credited upon the assigned quota of the principal's district of enrollment and go to reduce that assigned quota by so far serving to fill it. It seems to me that such is the proper and necessary import of the language. The plaintiff's construction

finds its only support in the expression " go to reduce the quota in such town, city or county," and to make it available, two things are needed. We must treat the word quota, not as the statute has previously treated it, as meaning the actual assigned quota, but as referring to an undefined proportion preceding the assignment and resting primarily upon the enrollment; and then as Daniels, J., said in the *Woodward* case, we must change the word " and " to " or " and make it read that the bounty was payable to principals whose substitutes were to " apply on " the quota under the December call *or* went to reduce it; that is, who either lessened its number after it was made by being applied upon it or lessened its number before it was made without being applied upon it at all. Clearly, the same man could not stand in both of the assumed positions, and so " and " was changed to " or " to meet the difficulty. We may make such a change where it is necessary to a correct interpretation, but not where the meaning is otherwise clear. The provision meant and was intended to mean that the substitute should be not only furnished " to apply on the quota," but should be both credited to the locality and actually applied upon the quota, as the words are " go to reduce it." Those words, we should observe, were not used in the fourth section in which the legislature described the case of an excess which lessened in advance the figures of an assigned quota. The language was " shall have operated to relieve in whole or in part said town, city or county from furnishing men under the call." That is a fitting and unambiguous expression and very different from the phrase " go to reduce it " used in connection with a definite and assigned quota. We find the same expression in a letter of the provost marshal general where he says "the quotas assigned under the call of December 19, 1864, must not be reduced except by actual enlistments in the army, navy and marine corps since the nineteenth ultimo." That was the only mode of reduction allowed, and when about one month later the act of 1865 used the same expression with reference to a substitute it meant the same thing, and so bounties were due under the law only to such principals as furnished substitutes

whose enlistments applied upon the assigned quotas of men and went to reduce such quotas by so far actually filling them.

I am not impressed by the argument that the reimbursement given to localities for an excess which operated to relieve them in the December assignment of quotas ought to extend to individuals whose substitutes effected *pro rata* the same relief. The cases are widely different. The individuals either owed military service or they did not. If they did, what they paid for a substitute simply performed their own duty by proxy and the state owed them nothing. No equity of theirs called for reimbursement, while the taxation of localities, when replaced by a general taxation for bounty purposes, did call for some scheme which to a limited degree would equalize the burden. There was no past equity due to principals who acted as they chose and in their own interests, and when, by the act of 1865, bounties were given for substitutes actually reducing the assigned quotas, it did so on the theory that the principal was the volunteer, and what was given was the bounty thenceforward paid by the state to all alike. If the principal who before December, 1864, had furnished a substitute was not enrolled as liable to military duty, a fact true of some of plaintiff's assignors, his action was wholly voluntary, a patriotic gift to the necessities of the state, which neither asked nor called for reimbursement, and which would be and ought to be left where the giver meant it should, to the credit of his worthy and honorable purpose.

Nor is there force in the suggestion that the words of section six, "who has furnished or shall furnish an acceptable substitute," indicate a retrospective as well as a future operation. The act of 1865 was passed in February, and intended to cover substitutes actually applied upon the December quota as assigned, between its date and the later passage of the law. The words have their full effect without relating back to an excess created before December. And the construction of the plaintiff would involve the injustice on the part of the legislature of providing for a bounty to principals whose substitutes

aided to create an excess, while giving none whatever to a volunteer for three years, two years of whose enlistment would be credited as part of the same excess. The answer made that such volunteers in general received large local bounties while the principal received none, is met by the consideration that the enrolled principal got just what he bargained for, which was immunity from the draft.

Upon this construction it follows that the state, at the time of the settlement with Erie county, owed nothing to the assignors of the plaintiff, and that they were not entitled to the bounties which they here seek to recover. That conclusion ought to be fatal to the plaintiff's cause of action, but is claimed not to be upon the ground that a part of the money equal to the bounties was paid by the state to the county for the use of the assignors, and the latter cannot question the validity of the payment, or the plaintiff's right to receive it. Such a doctrine in a proper and fitting case might find authority in its support, but has no just application to the present controversy. Gen. Marvin had no authority to make such a payment. His power was measured by the act of 1865, and he could only bind the state in accordance with its terms. If he undertook at all to pay the money of the state for the use of the assignors whom the state did not owe, and in contravention of his authority, he did not bind his principal by the unlawful and unauthorized act, and it cannot be said that the state paid the money for the use of plaintiff's assignors. The doctrine rests upon a conscious, voluntary and intended act by an alleged debtor, and cannot be founded upon an unauthorized misappropriation of its money by its agent. In every such case it is possible to say that the debtor waived his defense and admitted his liability, and the receiver of the money for the use of the creditor cannot retract or question the admission, but must perform his agency or trust. But here the state waived nothing and admitted nothing through the act of the agent in excess of his known authority. But General Marvin did nothing of the kind. He and Mr. Young both agree in saying that a reimbursement to the county, and

not bounties to individuals, was the purpose of the settlement, and that fact appears in spite of the rigid rulings of the court confining the witnesses quite too closely to specific memories of definite transactions. The plaintiff relies wholly upon the inference drawn from the details of the settlement, and his most potent factor was the claim that the state owed the bounties and as debtor paid them. With the disappearance of that fact, the inference sought to be drawn must give place to the contrary one, that the parties were not violating the law, but acting in conformity with its terms, and so long as what they did admits of that construction, we are bound to adopt it.

The papers used on the settlement, so far as I have been able to identify them, do not establish the plaintiff's theory, and will not justify the inference that both parties were seeking to violate the law for the benefit of persons not making claims in their own behalf, and having no rights or interests involved. The affidavit of Mr. Young was made upon a blank printed for the statement of more than one person, and using the plural instead of the singular number. The proper changes were made, except in one instance, and, correcting that, the affidavit is entirely consistent with a claim in behalf of the county for reimbursement under the fourth section of the act. That it does not say in terms that local bounties were paid by the county, but simply that they were paid, was the omission of the state agent in drawing the paper, who undoubtedly had no such distinction in his mind. The second paper was the certificate of the provost marshal of the district showing that the excess of years which went to relieve and lessen the December call was three thousand seven hundred and thirty-six; and was a document also needed for a settlement under the fourth section. The next paper shows by wards and towns the localities of the excess of years as above stated, and has this note at the end: "To be used only for obtaining reimbursement of bounty from the state of New York." The next paper is a receipt signed by Mr. Young "for Bounty Committee, Erie County." It is headed "Roll of recruits and substitutes," contains but a single name, and is followed by

Young's receipt for four hundred eighty-two thousand two hundred dollars, "being in full for bounties to the above named recruits for 2,408 years of excess on call of July 18, 1864, and one three years man at $600, credited to the state of New York on the call of December 19, 1865." We do not know with any certainty what list was referred to, but assuming it to have been the muster-rolls covering the substitutes furnished by plaintiff's assignors, it is still evident that the receipt was for a reimbursement of local bounties claimed to have been paid by the county and constituting excess under section four. The brevity of the statement does not alter the inference to be drawn from it as a settlement made in accordance with the law of 1865. Another paper present was headed " Statement of the number of men to whom bounties were paid by the county of Erie from September 1, 1864, to January 1, 1865," showing a total of over six hundred thousand dollars ; and another a statement of credits from July 18, down to December 31, 1864. Assuming that all these papers, which may have been used on the settlement were so used, though the fact is open to some degree of doubt, it is yet obvious that they are in all respects consistent with a claim made on the one side and admitted on the other for reimbursement of the county, and do not at all show or even tend to show, keeping in view the true construction of the act of 1865, a payment by Gen. Marvin for the use of plaintiff's assignors. And since the agent of the state had no authority to make any such payment and the county none to receive it, the only admissible inference is that the parties acted in accordance with the law and not in violation of it. If the county claimed or received too much, or took reimbursement for what it had not paid, that excess should justly go back to the state, and not to the profit of men having no concern or interest in the fund.

I have not omitted to take into account certain resolutions of the Erie supervisors and reports of the bounty committee indicating that individuals had equities against the county which were not denied but more or less recognized. Those facts do not alter the nature and character of the settlement

between the state and county. That stands as it was made, and as it must stand under the act of 1865.

These views are decisive of the case, and show that there is no tenable ground upon which the action can rest.

The judgment should be reversed and a new trial granted, cost to abide the event.

All concur.

Judgment reversed.